UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

MAXIE BROOKS                                    CIVIL ACTION NO. 10-cv-0028

VERSUS

PHYSICIANS MUTUAL INSURANCE CO.     MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

Danny L. Brooks was a passenger in a car that was involved in a serious accident. Soon afterward, a wound on his left foot developed gangrene, and a toe had to be amputated. Brooks was in the hospital recovering from the amputation when he died. Brooks had an accident and sickness indemnity policy issued by Physicians Mutual Insurance Company, and the policy had three accidental death riders that provided benefits totaling $80,000. Maxie Brooks ("Plaintiff"), the succession administrator, made a claim for benefits under the policy. Physicians Mutual Insurance Company ("Defendant") refused to pay.

Plaintiff filed suit in state court for the benefits due under the policy, plus statutory damages and attorney's fees for alleged arbitrary and capricious denial of the claim. Defendant removed the case based on diversity jurisdiction, and the case was referred to the undersigned pursuant to 28 U.S.C. § 636(c). Before the court is **Plaintiff's Motion for Partial Summary Judgment (Doc. 31)** that asks the court to declare that benefits are due under the accidental death riders. For the reasons that follow, the motion will be denied.

Mr. Brooks, who was 36 at the time of his death, had a difficult history of Type I diabetes. He was blind, he had received kidney and pancreas transplants, and he had required hospitalization on more than one occasion for drug resistant staph infections and other complications. He had been married a short time when his wife became sleepy and drove their Ford Mustang across the centerline and struck head on a GMC Yukon. Mr. and Mrs. Brooks were taken by ambulance to the emergency room at Willis-Knighton Pierremont Hospital. The ER records related to the July 1, 2007 accident list Mr. Brooks' associated injuries. They include decreased range of motion, painful injury, and swelling of the right foot. The left foot is not specifically mentioned. A radiology report from that day, however, indicates that Brooks complained of left heel pain, and X-rays showed several fractures of bones in the foot.

Brooks went to the Willis-Knighton South location on July 8 because he was out of pain medication. Notes include a reference to redness and swelling to the left ankle/foot. Brooks saw orthopedic physician Dr. Michael Haynie on July 10, 2007 regarding his complaint of left heel and thumb pain. Dr. Haynie noted: "He has multiple scrapes and contusions." He also mentioned that Brooks "has a swollen, discolored left foot."

Brooks saw Dr. Letchuman, a pain care consultant, on August 8. The record of the visit includes a notation of "left toe ulceration." Brooks returned to Willis-Knighton South on August 20. Nurses notes state that he was ambulatory when he arrived, complained that his left second toe was sore, and the foot was swollen. Physician's notes state that Brooks presented with redness of the left foot that resulted from an infected abrasion, with the

symptoms beginning gradually about three days earlier. Other nurses' notes state that there was an infected area on the second toe of the left foot, and that Brooks reported pain in that toe since July 1, 2007 (the date of the accident). The notes say that Brooks reported receiving a scratch on the toe during the car accident.

Brooks saw Dr. Haynie again on August 24. The physician wrote that Brooks was "quite happy with the way his foot is going with the exception of the fact that he has developed a pressure sore over his 2nd toe."

Brooks' wife, although initially released from the hospital, died from internal injuries 10 days after the accident. Brooks later traveled to Las Vegas with friends. After he returned home, the toe developed gangrene, and it was amputated on September 1, 2007. Dr. Tom Senff, who treated Brooks for several years, wrote in notes related to the amputation that Brooks had been involved in the accident on July 1 and "had an abrasion to the dorsum (top) of his right and left foot which he initially states seemed relatively minor." Dr. Senff wrote that it was after the Las Vegas trip that Brooks developed increasing redness and swelling in the dorsum of the left foot, precipitating visits to Willis-Knighton South beginning August 20. Dr. Charles Black, who consulted in connection with the amputation, described the accident in his notes and observed that "with that accident, he suffered injuries to the left second toe, which has evolved into dry gangrene."

Brooks was still in the hospital on September 7 when a nurse went into his room and found him unresponsive. A Code Blue was called. Dr. Senff responded and found no pulse or blood pressure. Efforts to revive Brooks were unsuccessful. Dr. Senff completed the

death certificate and noted that Brooks' immediate cause of death was electromechanical dissociation, with conditions leading to that cause being diabetes and peripheral vascular disease.

The accidental death benefit riders promise to pay benefits for accidental death of a covered person while the rider is in force, subject to the provisions of the policy. The insurer states that it will pay benefits "in the event injury results in the death of a covered person within 90 days after the date of the accident." It defines injury as "bodily injury caused by an accident ... and resulting in loss of life directly and independently of disease and all other causes." The main policy has a similar accidental death provision and includes the limitation that the company will not pay accidental death benefits for "injury or loss that is caused or contributed to by a sickness or disease."

Defendant first argues that Plaintiff did not establish that Brooks died because of an injury (the sore on the second toe of his left foot) that was caused by an accident. Defendants point to the lack of specific notation of such a wound in the emergency room records generated after the accident. Assuming Plaintiff meets that challenge, there is also the issue of whether the death was caused or contributed to by a sickness or disease. Louisiana jurisprudence holds that for sickness or disease to defeat recovery, it must be established as the predominant cause of death. If an injury aggravates an existing illness or disease, thereby accelerating death, the death is held to result directly and independently of all other causes. Murphy v. Continental Casualty Co., 269 So.2d 507, 518 (La. App. 1st Cir. 1972), citing Lipscomb v. Equitable Life Assur. Soc., 18 So.2d 167 (La. 1944). "In other words, if death

would not have occurred when it did but for the injury resulting from the accident, it was the direct, independent and exclusive cause of death at that time, even though death was hastened by the diseased condition." Id. Once the claimant establishes death resulted from an accident, the burden shifts to the insurer to show that the loss falls within the exclusionary clause. Murphy, 269 So.2d at 518.

With respect to whether the infection was caused by the accident, Plaintiff points to the medical records discussed above and the deposition testimony of Michael Domino and Gayle Leritte. Mr. Domino testified that he had known Brooks since junior high school. The two were like brothers and saw each other three or four times a week. When Domino heard about the accident two or three days after it happened, he called Brooks, who asked him for a ride home from the hospital. Domino took Brooks to Brooks' parents' home, and he next saw him three or four days later.

Domino said that, on the night he took Brooks home from the hospital, Brooks had a boot on his left foot with a bandage and thick gauze underneath. Domino said he first saw Brooks' bare feet two days after bringing him home from the hospital, when Brooks asked Domino to describe his feet for him. Domino described both feet as having some scrapes and scratches, but with a wound on the top of his left foot around the big toe area. It was a bit smaller than a dime. The scratches looked like they were healing, but the dime-size wound was not.

Gayle Leritte was a close friend of Brooks' wife. She went to visit the two at Brooks' parents' house a couple of days after the accident. She did not see Brooks' feet or hands at

that time because they were bandaged. Leritte said that Brooks was using a wheelchair at the time his wife returned to the hospital and at her funeral. Shortly after Mrs. Brooks died, Leritte was invited by a friend to accompany her pool league team to a national competition in Las Vegas, and they decided to invite Mr. Brooks to get his mind off things for awhile. They flew to Las Vegas on August 14. Leritte testified that Brooks used a wheelchair during the entire trip. The two shared a room with two beds, so that Leritte could help him, including wrapping his feet after he bathed. Leritte described seeing a dime-sized wound on the left foot. She added without being asked that it "was a wound stemming from the accident." Leritte said the scratches appeared to be healing, but this wound was not. Leritte said that she did not know that Brooks' foot had been bothering him prior to the first day in Las Vegas. She was surprised at the indication in the medical records that Brooks was ambulatory when he arrived at the emergency room on August 20, since he never took more than five steps in Las Vegas, and each of them was with her aid.

With respect to whether death would have occurred when it did but for the injury resulting from an accident, the parties offer the medical records as well as testimony from Dr. Senff and Dr. Thomas Worgul. Dr. Senff testified that he treated Brooks for over 10 years, both in the office and in the hospital. Brooks was "very prone to skin infections" and had been admitted to the hospital several times with abscesses and MRSA. He recalled that, when he first examined Brooks after the accident, Brooks had some abrasions on the tops of both feet. He said that any break in the skin increased the possibility of an infection. Dr. Senff was asked whether he thought Brooks would have died when he did if the accident had

not happened.  He was equivocal in his answer. He said the automobile accident "certainly didn't do him any good," but Senff did not know whether it made Brooks' death more likely. "I simply can't answer it."

Dr. Worgul was retained by Plaintiff and reviewed the medical records, except those from Schumpert Medical Center related to the amputation surgery.  He said those records were after the patient was admitted with gangrene so had nothing to do with what Plaintiff asked him to comment on.  He opined that the injury and gangrene of the second left toe was due to one or a combination of factors, the first being injuries received during the car accident.  Counsel for Plaintiff asked Dr. Worgul if "the development of the gangrene or his subsequent death after the surgery" would have happened if not for the accident.  Worgul responded that it was "likely if he did not have the accident then none of this would have happened."  Dr. Worgul conceded, however, that it was not uncommon for diabetic patients to have infections in their toes that lead to gangrene, and there could be other reasons than a car accident for such a condition.

Plaintiff bears the burden of proving her claims at trial.  To prevail on a motion for summary judgment, he must establish evidence that would entitle him to judgment as a matter of law if it went uncontroverted at trial. International Shortstop, Inc. v. Rally's, Inc., 939 F.2d. 1257, 1264 (5th Cir. 1991); Paramount Aviation Corp. v.  Agusta, 178 F.3d 132, 146 (3d Cir. 1999). All facts and inferences are viewed in the light most favorable to the non-moving party, and all reasonable doubts are resolved in that party's favor.  Puckett v. Rufenacht, Bromagen & Hertz, Inc., 903 F.2d 1014, 1016 (5th Cir. 1990).  If factual issues

or conflicting inferences exist, the court is not to resolve them; rather, summary judgment must be denied.  Id.

Plaintiff has done a good job of gathering the relevant evidence and making a sound argument that she should prevail on the merits, but the court finds that there are still reasonable inferences that could be drawn from the evidence that favor Defendant.  There is medical evidence that Brooks had an ulceration of the subject toe a few days after the accident, and he apparently told his physicians that it was caused by the accident, but the medical records from the care immediately after the accident do not reference this specific injury.  That does not mean the injury did not exist; medical records sometimes omit such matters, especially when there are several serious injuries to be addressed.  It does, however, permit at least a reasonable inference in favor of Defendant that the wound was not caused by the accident.  There is also room for doubt on the question of causation of death.  Brooks developed gangrene and, assuming it was the result of the accident, he died while in the hospital after being treated for the gangrene.  The medical testimony is less than certain as to whether the gangrene/amputation led to death or whether it might have happened anyway.

There appear to be questions of material fact that counsel against granting summary judgment.  Furthermore, even in the absence of a factual dispute, a district court has the authority to deny summary judgment where there is reason to believe that the better course would be to proceed to a full trial and test the merits. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2513 (1986); Black v. J.I. Case Co., Inc., 22 F.3d 568, 572 (5th Cir. 1994). The

undersigned believes that the best exercise of the court's discretion in these circumstances is to deny the motion and proceed to a trial on the merits.

Accordingly, **Plaintiff's Motion for Partial Summary Judgment (Doc. 31) is denied**.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 30th day of May, 2012.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE